IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Nos. 06-193-C, 06-191C, 06-205C, 06-434C, 06-442C, 06-449C
(Judge Wheeler)

REV. FR. PRISCO E. ENTINES, JUSTINA CORCELLES HERNANDEZ, FRANCISCO GUTIEREZ FERRER, JULIETA TABOADA ABELLA, MARIA LAPAY LAURENCIANO, and WENCESLAO N. RODRIGUEZ,

Plaintiffs,

v.

THE UNITED STATES OF AMERICA,

Defendant.

**DEFENDANT'S MOTION TO DISMISS**

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

DONALD E. KINNER
Assistant Director

KENNETH S. KESSLER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Telephone: (202) 307-0313
Facsimile: (202) 305-7643

Attorneys for Defendant

OF COUNSEL:

CAPTAIN KEVIN MCCART
Military Personnel Branch
U.S. Army Litigation Division
901 N. Stuart St.
Arlington, VA 22203-1837

June 14, 2006

## TABLE OF CONTENTS

**PAGE(S)**


BACKGROUND .......... 2

A. Historical Summary .......... 2

B. Relevant Legislative History .......... 4

1. Post World War II Legislative Actions .......... 4

2. The Modern Codification .......... 8

C. Status of Philippine World War II Veterans .......... 9

STATEMENT OF THE CASE .......... 9

ARGUMENT .......... 10

A. The Standards For Dismissal Pursuant To RCFC 12(b)(1) And 12(b)(6) .......... 10

B. Liberal Construction Of Pro Se Plaintiffs' Complaints .......... 12

C. Plaintiff Entines' Claims Are Barred By Collateral Estoppel And Res Judicata .......... 12

D. Plaintiffs Fail To Establish Jurisdiction .......... 15

1. Plaintiffs' Back Pay Claims Are Baseless .......... 15

2. Plaintiffs' Citizenship Claim Barred .......... 17

E. Statute Of Limitations Bars Plaintiffs' Claims .......... 18

1. 28 U.S.C. § 2501 Bars Plaintiffs' Claims Under The Tucker Act .......... 18

2. Plaintiffs' Causes Of Action Accrue At The Time Of Plaintiff's Discharge .......... 19

F. 38 U.S.C. § 511(a) Bars Plaintiffs' Claims For Veterans Benefits .......... 20

G. Plaintiffs' Claims Are Meritless .......... 22

1. 38 U.S.C. § 107 Is Constitutional .......... 22

2. Plaintiffs' Property Claims Are Baseless ................................................ 24

3. Plaintiffs' Citizenship Claims Are Meritless .......................................... 25

CONCLUSION ........................................................................................................... 27

# TABLE OF AUTHORITIES

## CASES

**PAGE(S)**

Allen v. McCurry,
449 U.S. 90 (1980) ........ 14

Anderson v. United States,
46 Fed. Cl. 725 (2000) ........ 14, 15

Andrews v. United States,
43 Fed. Cl. 561 (1999) ........ 15

Ballenger v. Marsh,
708 F.2d 349 (8th Cir. 1983) ........ 19

Beamon v. Brown,
125 F.3d 965 (6th Cir. 1997) ........ 22

Bell v. United States,
366 U.S. 393 (1961) ........ 24, 25

Besinga v. United States,
14 F.3d 1356 (9th Cir. 1994) ........ 16, 23

Bonen v. United States,
666 F.2d 536 (Ct. Cl. 1981) ........ 19

Booth v. United States,
990 F.2d 617 (Fed. Cir. 1993) ........ 10

Bowen v. United States,
292 F.3d 1383 (Fed. Cir. 2002) ........ 19

Bray v. United States,
785 F.2d 989 (Fed. Cir. 1986) ........ 19

Cabebe v. Acheson,
183 F.2d 795 (9th Cir. 1950) ........ 26

Califano v. Torres,
435 U.S. 1 (1978) ........ 23

Carlisle v. United States,
66 Fed. Cl. 627 (2005) .................................................................................... 20

Catawba Indian Tribe of S.C. v. United States,
982 F.2d 1564 (Fed. Cir. 1993) .................................................................... 19

Catellus Development Corp. v. United States,
31 Fed. Cl. 399 (1994) .................................................................................... 11

Cottrell v. United States,
42 Fed. Cl. 144 (1998) .................................................................................... 18

Dozier v. Ford Motor Co.,
702 F.2d 1189 (D.C. Cir. 1983) .................................................................... 14

Eastport S.S. Corp. v. United States,
372 F.2d 1002 (Ct. Cl. 1967) ................................................................... 15, 16

Entines v. U.S.,
39 Fed. Cl. 673 (Fed. Cl. 1997) .................................................................... 20

Entines v. U.S.,
185 F.3d 881 (Fed.Cir. 1999) ....................................................................... 13

Entines v. U.S.,
526 U.S. 1117 (May 17, 1999) ..................................................................... 13

Federated Dept. Stores, Inc. v. Moitie,
452 U.S. 394 (1981 ) ....................................................................................... 14

Fedorenkov. United States,
449 U.S. 490 (1981) ....................................................................................... 27

Ferreiro v. United States,
72 Fed. Cl. 1 (2006) ....................................................................................... 20

Filipino Am. Veterans & Dependents Ass'n v. United States,
391 F. Supp. 1314 (N.D. Cal. 1974) ........................................................ passim

Forshey v. Principi,
284 F.3d 1335 (Fed. Cir. 2002) .................................................................... 12

GAF Corp. v. United States,
818 F.2d 901 (D.C. Cir. 1987) ...................................................................... 14

Geyen v. Marsh,
775 F.2d 1303 (5th Cir. 1985) .......... 19

Gonzalez v. United States,
48 Fed. Cl. 176 (Fed. Cl. 2000) .......... 25

Gordon v. Nat'l Youth Work Alliance,
675 F.2d 356 (D.C. Cir. 1982) .......... 13

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) .......... 11

Hamlet v. United States,
63 F.3d 1097 (Fed. Cir. 1995) .......... 16

Hanlin v. United States,
214 F.3d 1319 (Fed. Cir. 2000), rev'd & remanded, 50 Fed. Cl 697 (2001) .......... 20, 21

Harris v. Rosario,
446 U.S. 651 (1980) .......... 23

Hart v. United States,
910 F.2d 815 (Fed. Cir. 1990) .......... 18

Henke v. United States,
60 F.3d 795 (Fed. Cir. 1995) .......... 11

Holley v. United States,
124 F.3d 1462 (Fed. Cir. 1997) .......... 16

Hooven v. Evatt,
324 U.S. 652 (1945) .......... 2, 26

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir. 1988) .......... 19

Hughes v. Rowe,
449 U.S. 5 (1980) .......... 12

INS v. Hibi,
475 F.2d 7, rev'd on other grounds, 414 U.S. 5 (1973) .......... 26

INS v. Pangilinan,
486 U.S. 875 (1988) .......... 27

Indium Corp. of America v. Semi-Alloys, Inc.,
781 F.2d 879 (Fed. Cir. 1985) .......... 11

Irwin v. Veterans Administration,
498 U.S. 89 (1991) .......... 18

James v. Caldera,
159 F.3d 573 (Fed. Cir. 1998) .......... 16, 22

Karuk Tribe of Cal. v. Ammon,
209 F.3d 1366 (Fed. Cir. 2000) .......... 24

Kasap v. Folger Nolan Fleming & Douglas, Inc.,
166 F.3d 1243 (D.C. Cir. 1999) .......... 13

Lane v. Pena,
518 U.S. 187 (1996) .......... 18

LeBlanc v. United States,
50 F.3d 1025 (Fed. Cir. 1995) .......... 17, 22

Longhine v. United States,
230 Ct. Cl. 920 (1982) .......... 19

Lyons v. United States,
45 Fed. Cl. 399 (1999) .......... 15

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003) .......... 16, 19

Mathis v. United States,
391 F.2d 938 (Ct. Cl. 1968) .......... 20

McMahon v. United States,
342 U.S. 25 (1951) .......... 12

McNutt v. General Motors Acceptance Corp. of Indiana,
298 U.S. 178 (1936) .......... 10, 11

Montalvo v. United States,
231 Ct. Cl. 980 (1982) .......... 17

Mother's Restaurant, Inc. v. Mama's Pizza, Inc.,
723 F.2d 1566 (Fed. Cir. 1983) .......... 13

Nager Elec. Co. v. United States,
368 F.2d 847 (Ct. Cl. 1966) .......... 19

Nevada v. United States,
463 U.S. 110 (1983) .......... 14

Nichols v. Hughes,
721 F.2d 657 (9th Cir. 1983) .......... 19

Norton v. Larney,
266 U.S. 511 (1925) .......... 12

O. Ahlborg & Sons, Inc. v. United States,
74 Fed. Cl. 178 (2006) .......... 13

Ontario Power Generation, Inc. v. United States,
369 F.3d 1298 (Fed. Cir. 2004) .......... 17

Perry v. Sinderman,
408 U.S. 593 (1972) .......... 24

Powell v. United States,
39 Fed. Cl. 236 ( 1997) .......... 12, 14, 20

Quiban v. Veterans Administration,
928 F.2d 1154 (D.C. Cir. 1991) .......... 9, 16, 22, 23

Real v. United States,
906 F.2d 1557 (Fed. Cir. 1990) .......... 19

Reynolds v. Army & Air Force Exch. Serv.,
846 F.2d 746 (Fed. Cir. 1988) .......... 11

Rochman v. United States,
27 Fed. Cl. 162 (1992) .......... 11

Ruckelshaus v. Monsanto Co.,
467 U.S. 986 (1984) .......... 24

In re Russell,
155 F.3d 1012 (8th Cir. 1998) .......... 22

Saldino v. United States,
62 Fed. Cl. 782 (2004) .......... 13

Sanford v. United States,
32 Fed. Cl. 363 (1994) ............................................................................................ 17

Scheuer v. Rhodes,
416 U.S. 232 (1974) ............................................................................................ 11

Smith v. Sec'y of the Army,
384 F.3d 1288 (Fed. Cir. 2004) ............................................................................ 17

Soriano v. United States,
352 U.S. 270 (1957) ........................................................................................ 18, 19

Spehr v. United States,
51 Fed. Cl. 69 (2002), aff'd, 49 Fed. Appx. 303 (Fed. Cir. 2002) ................................ 17

Sugrue v. Derwinski,
26 F.3d 8 (2d Cir. 1994) ....................................................................................... 22

Talon v. Brown,
999 F.2d 514 (Fed. Cir. 1993) ....................................................................... 16, 22, 23

United Pacific Ins. Co. v. United States,
464 F.3d 1325 (Fed. Cir. 2006) ............................................................................ 11

United States v. King,
395 U.S. 1 (1969) ................................................................................................ 12

United States v. Larionoff,
431 U.S. 864 (1971) ............................................................................................ 25

United States v. Mitchell,
445 U.S. 535 (1980) ............................................................................................ 12

United States v. Mitchell,
463 U.S. 206 (1983) ............................................................................................ 14

United States v. Nordic Village, Inc.,
503 U.S. 30 (1992) .............................................................................................. 18

United States v. Sherwood,
312 U.S. 584 (1941) ............................................................................................ 12

United States v. Testan,
424 U.S. 392 (1976) ..................................................................................... 15, 17, 18

Van Allen v. United States,
66 Fed. Cl. 294 (2005) .................... 20

Vincin v. United States,
468 F.2d 930 (Ct. Cl. 1972) .................... 20

Walters v. Sec'y of Defense,
725 F.2d 107 (D.C. Cir. 1983) .................... 19

Webb's Fabulous Pharmacies, Inc. v. Beckwith,
449 U.S. 155 (1980) .................... 24

Williams v. Sec'y of the Navy,
787 F.2d 552 (Fed. Cir. 1986) .................... 19

Wyatt v. United States,
2 F.3d 398 (Fed. Cir. 1993) .................... 24

Zucker v. United States,
758 F.2d 637 (Fed. Cir. 1985) .................... 25

Zuspan v. Brown,
60 F.3d 1156 (5th Cir. 1995) .................... 22

**STATUTES**

8 U.S.C. § 1001 .................... 26

8 U.S.C. § 1002 .................... 26

8 U.S.C. § 1003 .................... 26

8 U.S.C. § 1004 .................... 26

8 U.S.C. § 1005 .................... 26

8 U.S.C. § 1421(e) .................... 26

8 U.S.C. § 1440 .................... 26

28 U.S.C. § 1491(a)(1) .................... 21

28 U.S.C. § 2501 .................... 18, 20

38 U.S.C. § 37 .......... 21

38 U.S.C. § 72 .......... 21

38 U.S.C. § 107 .......... passim

38 U.S.C. § 502 .......... 21

38 U.S.C. § 511 .......... 10, 20, 21, 22

38 U.S.C. § 1975 .......... 21

38 U.S.C. § 7252(a) .......... 21

38 U.S.C. § 7292(c) .......... 21

H.R. 4407 .......... 6

Public Law 73-127, 48 Stat. 456 .......... 2

Pub. L. No. 100-687, Div. A, § 101, 102 Stat. 4105-06 .......... 21

Pub. L. No. 100-687, § 301(a), 102 Stat 4113, 4120 .......... 21

Pub. L. No. 102-83, § 2(a), 105 Stat. 378, 388 (1991) .......... 21

Pub. L. No. 106-377, § 501(a)(1), 114 Stat. 1441, 1441A-57 .......... 9

Pub. L. No. 108-183, § 211(a), 117 Stat. 2651, 2657 .......... 9

Public Law 301, 79th Congress, 60 Stat. 14 .......... 8

Public Law 391, 79th Congress, 60 Stat. 223 .......... 8

**MISCELLANEOUS**

5 Wright & Miller, Federal Practice and Procedure § 1277 (2004) .......... 13

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| REV. FR. PRISCO E. ENTINES,<br>JUSTINA CORCELLES HERNANDEZ,<br>FRANCISCO GUTIEREZ FERRER,<br>JULIETA TABOADA ABELLA,<br>MARIA LAPAY LAURENCIANO, and<br>WENCESLAO N. RODRIGUEZ,<br><br>Plaintiffs,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case Nos.: 06-193C, 06-191C,<br>06-205C, 06-434C,<br>06-442C, 06-449C<br><br>Judge Wheeler |

---

**DEFENDANT'S MOTION TO DISMISS**

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests the Court to dismiss the complaints for lack of jurisdiction and failure to state a claim, respectively. Plaintiffs cannot establish the jurisdiction of this Court as there is no money-mandating statute to support their prayers for back pay and related benefits. Further, because plaintiffs' claims accrued more than six years before these complaints were filed, they are barred by the statute of limitations. Finally, the demand for benefits like those claimed by plaintiffs has been extensively litigated in this circuit and others and found to be without merit, leaving no doubt that plaintiffs have failed to state claims for which relief can be granted. In support of this motion, we rely upon the complaints,[1] and the following brief.

1 For purposes of this motion only, unless otherwise indicated, we accept as true the factual allegations as set forth in plaintiffs' complaints. However, in the event our motion is denied, we reserve the right to contest each and every factual allegation in the complaints.

# BACKGROUND

## A. Historical Summary

To better understand this case, we provide the following background information. The Philippine Islands were ceded by Spain to, and became a territory of, the United States under the 1898 Treaty of Paris. Filipino Am. Veterans & Dependents Ass'n v. United States, 391 F. Supp. 1314, 1316 (N.D. Cal. 1974).

On March 24, 1934, Congress passed the Philippine Independence Act, Public Law 73-127, 48 Stat. 456 (hereinafter "the Act of 1934 "), providing for eventual Philippine independence and creating, in the interim, a Commonwealth of the Philippines vested with certain powers over its own internal affairs. It was not until July 4, 1946, however, that this interim Philippine Commonwealth received its grant of independence by a Presidential Proclamation of that date in fulfillment of the promise contained in the Act of 1934. Id.

During the 12-year interval between the Act of 1934 and final independence in 1946, the Philippines were in what has been described as a "unique" status. Although not in all respects a "foreign" territory, the Philippines were treated by the Act of 1934 as a foreign country for many purposes, e.g., Filipino citizens were treated as aliens for immigration purposes; foreign service officers assigned to the Philippines were treated as if stationed in a foreign country; and the Act of 1934 defined "United States" as excluding the Philippines. See Hooven v. Evatt, 324 U.S. 652, 677-8, 692 (1945).

Nevertheless, the United States retained plenary and unrestricted power over the Philippines until its sovereignty over them was formally withdrawn in 1946. Id. at 692. Among other things, the Act of 1934 reserved to the United States the power to maintain military bases and armed forces in the Philippines and, upon order of the President of the United States, the

right "to call into the service of such armed forces all military organized by the Philippine government." Filipino Am. Veterans, 391 F. Supp. at 1317.

It was under this authority that President Roosevelt, by an Executive Order of April 26, 1941, did call "into the service of the armed forces of the United States all military organized by the Philippine Government" for the period of the imminent World War II emergency and placed that military under the command of general officers and commandants of the United States Army and Navy. Id.

In April of 1941, the United States assumed the responsibility for payment of the Philippine servicemen's pay as previously established by the Philippine Commonwealth. That scale of service pay was less than the rate of pay for regular United States enlistees or inductees. Legislation was introduced in the United States Congress to increase the Filipino service pay scale to United States Army levels but no such legislation was ever enacted.[2]

---

2 United States officers were largely responsible for training the Philippine Army after it had been called into the service of our armed forces, and the United States paid the costs of training and mobilization. See Office of the Center for Military History, The Status of Members of Philippine Military Forces During World War II, at 11-12 (June 1973) (unpublished manuscript prepared for the Government's use in Filipino Am. Veterans & Dependents Ass'n v. United States, 391 F. Supp. 1314 (N.D. Cal. 1974) (three-judge court)) (hereinafter "OCMH Study"), referenced by plaintiffs and included as Defense Exhibit 1.

After the outbreak of war, Congress authorized $269 million to mobilize, train, equip, and pay the Philippine Army, and it gave General MacArthur, commander of the United States Armed Forces in the Far East ("USAFFE"), authority to allocate expenditures. See OCMH Study at 12-13. Filipinos, however, were never paid wages equal to those that Americans received, despite General MacArthur's recommendations and some early support by the War Department for pay equality. The Philippines did, without American opposition, raise pay for Philippine Army enlisted personnel to the higher level enjoyed by Philippine Scouts, but both groups received only a fraction of the pay that American enlisted personnel received. See OCMH Study at 34-35. Just after American reentry to the Philippines in October 1944, the Philippine president attempted to raise pay rates for Philippine enlisted soldiers to the U.S. Army level, apparently with General MacArthur's concurrence. By that time, however, the War Department resisted. The Department cited not just the consequences to the United States Treasury, but also the lower cost and standard of living in the Philippines, the inflationary consequences of paying Philippine soldiers wages that vastly exceeded those of most Philippine

**B. <u>Relevant Legislative History</u>**

1. Post World War II Legislative Actions.

In October, 1945, after the end of World War II and while Congress was considering a $200 million appropriation for the support of the Philippine Army in accordance with its practice during the War, the Chairman of the SubCommittee of the Senate Committee on Appropriations sent a letter to the Director of the Veterans Administration, requesting information concerning the status of the Filipino servicemen. He specifically inquired as to the potential cost of their veterans' benefit coverage. Filipino Am. Veterans, 391 F. Supp. at 1318.

The Director of the Veterans Administration responded by expressing the administrative view that "those who served in the active military or naval forces of the United States," did include "persons who were a part of the organized forces of the government of the Commonwealth of the Philippines called into service of the Armed Forces of the United States pursuant to military order of the President of the United States, July 26, 1941." Id.

In his same 1945 letter, the Director gave to the subcommittee his estimate that the total cost of paying veterans' benefits to members of the Philippine Commonwealth Army and their dependents, under then existing veterans' laws, would amount in the long run to approximately three billion dollars. Id.

---

workers and government officials, and the Philippine government's likely inability to continue the higher rates of pay after independence. See OCMH Study at 37-41.

After receiving this response, the Chairman of the Senate Subcommittee made several important conclusions, which we set forth as a note because of its length.[3] The Congress

---

3 According to the Chairman of the Subcommittee:

> Three billion dollars is a substantial sum of money, and if Filipinos were eligible to receive it, there would be good reason to reduce or eliminate other proposed expenditures by the United States for their benefit. But no one could be found who would assert that it was ever the clear intention of Congress that such benefits as are granted under the Servicemen's Readjustment Act of 1940, as amended -- the GI Bill of Rights -- should be extended to the soldiers of the Philippine Army. There is nothing in the text of any of the laws enacted by Congress for the benefit of veterans to indicate such intent. The real question in the case of the soldiers of the Philippine Army is whether they have served 'in the active military or naval service of the United States.' There is nothing to indicate that there was any discussion of the meaning of that term, probably because it is generally well recognized and has been used in many statutes having to do with members or former members of the American armed forces. It would normally be construed to include persons regularly enlisted or inducted in the regular manner in the military and naval service of the United States. There is no suggestion that Congress had in mind covering under the GI Bill of Rights any classes not theretofore understood to be included within the meaning of the words 'in the active military or naval service of the United States,' which is the primary basis for entitlement to its benefits. It is certainly unthinkable that the Congress would extend the normal meaning of the term to cover the large number of Filipinos to whom it has been suggested that the Servicemen's Readjustment Act of 1940 applies, at a cost running into billions of dollars, aside from other considerations, without some reference to it either in the debates in Congress or in the committee reports.
>
> Upon the principle that the Philippine Army was serving with our Army but was not a part of the armed forces of the United States, the War Department took prompt action to disapprove the proposal to extend the American pay rates to soldiers serving in the Philippine Army and requested that the proclamation making such a promise be rescinded. Members of the Philippine Army did not actually receive the pay of an American soldier, which has a direct bearing upon the question as to whether that army is a part of the armed forces of the United States.

then enacted the 1946 legislation set forth above, appropriating $200 million for the support of the Philippine Army, but adding as a rider the 1946 legislation that limited U.S. benefits for World War II Philippine veterans.

When the appropriation, bearing this rider, came to President Truman, he approved it. He embraced the idea that the United States had a moral obligation to provide for the Philippine veterans who fought alongside U.S. service members during the war, but recognized that there were certain "practical difficulties in making payments to Philippine Army veterans under the GI

---

> It was, therefore, decided that the legal situation must be promptly clarified and that the best way to accomplish it was by way of an amendment to the surplus appropriation rescission bill, H.R. 4407, then under consideration by this committee, and which was to provide for an appropriation of $200,000,000 for the Army of the Philippines. Senator McKellar, as acting chairman, appointed me to serve on a subcommittee along with Senator Russell of Georgia, and Senator Brooks of Illinois. We are the authors of the following amendment, which finally became a law on February 18, 1946, as Public Law 301, Seventy-ninth Congress: (here is set forth the 1946 legislation here in question).
>
> The first effect of the amendment from the point of view of the United States Treasury was to reduce a liability for veterans' benefits from $3,000,000,000 to $500,000,000, both of these amounts being based upon estimates made by the Veterans Administration. This was accomplished by limiting such benefits to pensions on account of service-connected disability or death and by further providing that, when allowed, such pensions shall be paid at the rate of one Philippine peso for each dollar otherwise authorized. Provision was not made for hospital and medical care, because the committee was advised that there are 10,000 surplus hospital beds and other hospital equipment in the Philippine Islands which will be transferred to the Philippine government under the provisions of the Tydings bill, S. 1610. That bill also contains a provision which authorizes the United States Public Health Service to cooperate with the Philippine government in hospital activities.

Filipino, 391 F. Supp. at 1318.

Bill of Rights" and that he was "preparing a plan to meet such practical difficulties and expected to request Congress to implement a plan when it is evolved." Filipino Am. Veterans, 391 F. Supp. at 1319. Upon receipt of President Truman's message, the Chairman of the Subcommittee made another important statement bearing upon the congressional rationale for the 1946 legislation.[4]

---

4 The statement helps form the justification for the statute.

> There is merit in President Truman's assertion that there is 'a moral obligation of the United States to look after the welfare of Philippine Army veterans,' but his statement recognized 'that certain practical difficulties exist in applying the GI Bill of Rights to the Philippines.' It was the view of the Congress that immediate action was required, that facts were not available upon which to base a proper solution to these 'practical difficulties.' Consequently it was decided that, except for pensions based upon service-connected disability or death, the best way to proceed was to wipe the slate clean. The GI Bill of Rights is intended to benefit an American who served in the armed forces and who, upon his discharge from the service, returns to civil life in the United States, where American standards of living prevail. A peso in the Philippines will go as far as a dollar in the United States. A Filipino veteran does not need 150 pesos a week as unemployment compensation. Neither is he justified in asking for a loan of 8,000 pesos to buy a farm or to go into business. Whenever any part of the GI Bill of Rights is extended to Filipino veterans, the cost of living in the Philippines and other economic factors must be given careful consideration. The first effect of the amendment from the point of view of the United States Treasury was to reduce a liability for veterans' benefits from $3,000,000,000 to $500,000,000, both of these amounts being based upon estimates made by the Veterans Administration. This was accomplished by limiting such benefits to pensions on account of service-connected disability or death and by further providing that, when allowed, such pensions shall be paid at the rate of one Philippine peso for each dollar otherwise authorized. As I see it, the best thing the American government can do is to help the Filipino people to help themselves. Where there was a choice between expenditures for the rehabilitation of the economy of the Philippine Islands and payments in cash to Filipino veterans, I am sure it is better to spend any equal sum of money, for example, on improving the roads and port facilities. What the Filipino veteran needs is steady

2. <u>The Modern Codification.</u>

The statute plaintiffs attacks in their complaints, 38 U.S.C. § 107, is merely a modern codification of the 1946 rider discussed above (specifically Title II of Public Law 301, 79th Congress, 60 Stat. 14, entitled First Supplemental Rescission Act of 1946 (as to sub. (a)) and (as to sub. (b)) Public Law 391, 79th Congress, 60 Stat. 223, entitled Second Supplemental Rescission Act of 1946). Section 107(a) provides:

> Service before July 1, 1946, in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the Armed Forces of the United States pursuant to the military order of the President, dated July 26, 1941, . . . shall not be deemed to have been active military, naval, or air service for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the Armed Forces **except benefits under** (1) contracts of National Service Life Insurance entered into before February 18, 1946; (2) chapter 10 of title 37 [Payments to Missing Persons] and (3) chapters 11 [Compensation for service-connected disability or death], 13 [Compensation for dependents for service-connected disability or death] (except section 1312(a)), 23 [Burial benefits], and 24 [National cemeteries and memorials](to the extent provided for in section 2402(8)) of this title.

38 U.S.C. § 107(a) (emphasis added). The statute also provides that, except as provided in 38 U.S.C. § 107(c) and (d), payments of the allowed benefits "shall be made at a rate of $0.50 for each dollar authorized." <u>Id.</u>

Congress subsequently amended 38 U.S.C. § 107 to provide for payment, at the full-dollar rate, of compensation to certain veterans of the Philippine Commonwealth Army,

---

> employment rather than to depend for his living upon a monthly payment sent from the United States . . . .

<u>Filipino Am Veterans</u>, 391 F. Supp. at 1319.

recognized guerrilla forces, and New Philippine Scouts and their survivors who lawfully reside in the United States. Veterans Benefits Act of 2003, Pub. L. No. 108-183, § 211(a), 117 Stat. 2651, 2657; Departments of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations Act, 2001, Pub. L. No. 106-377, § 501(a)(1), 114 Stat. 1441, 1441A-57.

**C. Status of Philippine World War II Veterans**

For purposes of analyzing cited and related case law, Philippine World War II veterans are divided among four groups: the Old Philippine Scouts, the Philippine Army, the New Philippine Scouts, and the Philippine guerrilla fighters. See OCMH Study at 48-58; Quiban v. Veterans Administration, 928 F.2d 1154, 1157 (D.C. Cir. 1991). For historical reasons, the first group has always been considered a United States Army unit, and has always received full veterans benefits. Quiban, 928 F.2d at 1156. Because of the 1946 legislation, however, the latter groups have not been accorded equally advantageous treatment. The guerrilla fighters are generally considered part of the Philippine Army. Id.; see also OCMH Study at 48-58.

## STATEMENT OF THE CASE

Between March 8, 2006 and June 6, 2006, *pro se* plaintiffs filed these suits against the United States. In their complaints, plaintiffs allege, upon their own behalf or upon behalf of family members, some of whom are deceased, that the denial of veterans' benefits, payment of veterans' benefits at the rate of $0.50 for each dollar payable, and lower wages paid to Philippine service members during World War II constituted a breach of enlistment contracts and further violated the Fifth and Fourteenth Amendments of the Constitution, in particular the Takings Clause of the Fifth Amendment. See generally Complaints.

Plaintiffs request that this Court order the military to pay them the difference in back pay between the amount of pay they actually received and the amount paid to U.S. service members during World War II. Plaintiffs also ask this Court to grant "just compensation for the taking" of their property as a result of section 107(a) and (b). Additionally, plaintiffs ask this Court to award them all pay, allowances and benefits that any "members of the United States Armed Forces in World War II were, and are, entitled to." Further, plaintiffs also demand to be recognized as United States citizens and that the Government pay interest for any monetary awards, Court costs, and attorney's fees claims.

For the below reasons, however, the Court should dismiss plaintiffs' complaints for lack of jurisdiction because they have failed to identify a money-mandating statute entitling them to relief. Further, their claims are barred by the statute of limitations and 38 U.S.C. § 511. Finally, plaintiffs' claims have already been litigated and rejected in this Circuit and/or various Federal courts across the country, as noted below. Therefore, this Court should dismiss this matter with prejudice.

## ARGUMENT

### A. The Standards For Dismissal Pursuant To RCFC 12(b)(1) And 12(b)(6)

Subject matter jurisdiction may be challenged at any time by the parties, by the Court sua sponte, or on appeal. Booth v. United States, 990 F.2d 617, 620 (Fed. Cir. 1993). Once jurisdiction is challenged by the court or the opposing party, the plaintiff bears the burden of establishing jurisdiction. McNutt v. General Motors Acceptance Corp. of Indiana, 298 U.S. 178, 189 (1936). A plaintiff must establish jurisdiction by a preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

When deciding a motion to dismiss for lack of subject matter jurisdiction, this Court must assume that all undisputed facts alleged in the complaints are true and must draw all reasonable inferences in the plaintiffs' favor. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995). Once the Government challenges jurisdiction, however, the plaintiffs cannot merely rely upon allegations in the complaints, but must instead bring forth relevant, competent proof to establish jurisdiction. McNutt, 298 U.S. at 189; see also Reynolds, 846 F.2d at 747; Catellus Development Corp. v. United States, 31 Fed. Cl. 399, 404-405 (1994). This Court may consider all relevant evidence in order to resolve the factual dispute, including evidentiary matters outside the pleadings. Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985).

A motion to dismiss for failure to state a claim upon which relief can be granted is appropriate "when the facts asserted by the plaintiff do not entitle him to a legal remedy." United Pacific Ins. Co. v. United States, 464 F.3d 1325, 1327 (Fed. Cir. 2006). In reviewing a dismissal for failure to state a claim, this Court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." Id. at 1327-28 (quoting Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)). Nonetheless, the Court should not place any weight upon any assertions in the complaints other than allegations of fact, because "legal conclusions, deduction, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992) (citation omitted). Thus, plaintiffs' identification of their legal theories of recovery is not entitled to a presumption of correctness.

**B. Liberal Construction of Pro Se Plaintiffs' Complaints**

While *pro se* litigants are generally held to a lower standard in pleading and proving the existence of subject matter jurisdiction, Hughes v. Rowe, 449 U.S. 5, 9 (1980), jurisdiction cannot be presumed, but must be affirmatively and distinctly plead in the complaint. Norton v. Larney, 266 U.S. 511, 515-16 (1925); Forshey v. Principi, 284 F.3d 1335, 1357 (Fed. Cir. 2002). The "United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." United States v. Sherwood, 312 U.S. 584, 586 (1941); see also United States v. Mitchell, 445 U.S. 535, 538 (1980). Waivers of sovereign immunity cannot be implied, but must be unequivocally expressed. Mitchell, 445 U.S. at 538 (quoting United States v. King, 395 U.S. 1, 4 (1969)). In addition, such statutory waivers "are to be construed strictly in favor of the sovereign." McMahon v. United States, 342 U.S. 25, 27 (1951)(footnote omitted).

**C. Plaintiff Entines' Claims Are Barred By Collateral Estoppel and Res Judicata**

On November 22, 1996, plaintiff Entines filed a Complaint in this Court, Civil Docket No. 96-740-C. See Exhibit 2 ("1996 Complaint"). Plaintiff attempted to bring a class action "of Filipino veterans who fought under the United States Armed Forces during the Second World War as members of the Philippine Commonwealth Army called into service by the United States government on July 26, 1941, as well as members of guerilla resistance units organized in the Philippines. . . [and] survivors and dependents of these veterans." 1996 Complaint, ¶ 2. In April, 1997, the United States moved to dismiss the 1996 Complaint. See Exhibit 3 (Defendant's Motion to Dismiss). On December 16, 1997, this Court granted defendant's motion and dismissed the case because it found that all of the claims asserted were barred by the applicable statute of limitations. See 39 Fed. Cl. 673 (1997). On January 14, 1999, the United

States Court of Appeals for the Federal Circuit affirmed the decision. See Entines v. U.S., 185 F.3d 881 (Fed.Cir. 1999) (table) (available at 1999 U.S. App. LEXIS 2834). On May 17, 1999, the United States Supreme Court denied a petition for a writ of certiorari. See Entines v. U.S., 526 U.S. 1117 (May 17, 1999) (table).

Plaintiff Entines' current claims against the United States must be dismissed pursuant to the doctrines of issue and/or claim preclusion, because the issue of subject matter jurisdiction for his claims has already been litigated. "The underlying rationale for issue preclusion is that a party 'who had litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over again.'" O. Ahlborg & Sons, Inc. v. United States, 74 Fed. Cl. 178, 187 (2006) (quoting Mother's Restaurant, Inc. v. Mama's Pizza, Inc., 723 F.2d 1566, 1569 (Fed. Cir. 1983)).

> Issue preclusion is warranted if the following factors are met: (1) the issue in the second action is identical to the one decided in the first action; (2) the issue was actually litigated in the first action; (3) the resolution of the issue was essential to a final judgment in the first action; and (4) the plaintiffhad a full and fair opportunity to litigate the issue in the first action.

Id.

Collateral estoppel applies to findings of jurisdiction. Saldino v. United States, 62 Fed. Cl. 782, 790-91 (2004); Kasap v. Folger Nolan Fleming & Douglas, Inc., 166 F.3d 1243, 1248 (D.C. Cir. 1999) ("In fact, under principles of issue preclusion, even a case dismissed *without* prejudice has preclusive effect on the jurisdictional issue litigated.") (emphasis added).[5] Thus,

---

5 The expiration of the limitations period is typically an affirmative defense and not a bar to jurisdiction. See, e.g., Gordon v. Nat'l Youth Work Alliance, 675 F.2d 356, 360 (D.C. Cir. 1982); see also 5 Wright & Miller, Federal Practice and Procedure § 1277 (2004). However, the sovereign immunity of the United States requires a plaintiff to demonstrate that it meets all conditions imposed by Congress for establishing jurisdiction, including initiating the action within the applicable limitations period, and thus renders it jurisdictional. See United States v. Mitchell, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued

"the party alleging jurisdiction in a second action will be precluded from relitigating any issue of fact or law determined against it in the first action which it had full opportunity to litigate." GAF Corp. v. United States, 818 F.2d 901, 913 (D.C. Cir. 1987). A plaintiff cannot relitigate a jurisdictional dismissal by "relying upon those [facts] that existed at the time of the first dismissal." Dozier v. Ford Motor Co., 702 F.2d 1189, 1192 n.4 (D.C. Cir. 1983). The only exception to collateral estoppel with respect to jurisdiction is where the jurisdictional shortcoming is cured by a change in circumstances. Id. at 1198 ("[W]here a jurisdictional defect is cured or otherwise loses its controlling force, a second action may be brought under the same jurisdiction.").

The doctrine of res judicata precludes a party from litigating a previous claim, whether by presenting the same arguments or "with any other admissible matter which might have been offered for that purpose." Nevada v. United States, 463 U.S. 110, 130 (1983). Thus, res judicata, as its modern name "claim preclusion" suggests, relates only to the claim that was previously litigated. See Allen v. McCurry, 449 U.S. 90, 94 (1980). "[A] final judgment precludes the parties or their privies from relitigating issues that were, or could have been raised in that action." Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981 ). "The defense of res judicata operates whenever a party attempts to relitigate a closed matter." Powell v. United States, 39 Fed. Cl. 236, 237 ( 1997). "Claim preclusion is a judicially created tool which protects the parties from duplicative litigation and encourages judicial economy." Anderson v. United States, 46 Fed. Cl. 725, 729 (2000).

There are four elements to the defense of res judicata (claim preclusion):

---

without its consent and that the existence of consent is a prerequisite for jurisdiction.").

> (1) that there exists a prior court decision constituting a valid and final judgment; (2) the case at bar must embody the same cause of action or claims as did the prior action as in the prior decision; (3) the prior decision must have been made on the merits of the case, and (4) the same parties must be involved in both cases.

Lyons v. United States, 45 Fed. Cl. 399, 403 (1999); see also Anderson v. United States, 46 Fed. Cl. 725, 729 (2000); Andrews v. United States, 43 Fed. Cl. 561 (1999).

All four elements of *res judicata* have been satisfied in the instant case. Plaintiff Entines filed substantially the same action in 1996. See Exhibit 2. The parties and the claims are the same. Id. The dismissal by the Court of Federal Claims for untimeliness was affirmed on appeal. Accordingly, the 1996 Court of Federal Claims case resulted in a final judgment against Entines. Moreover, any of plaintiff's claims in the instant case that were not actually raised in the prior cases surely could have been. Because all of the elements of the doctrine are satisfied, this case should be dismissed.

**D. Plaintiffs Fail to Establish Jurisdiction**

1. Plaintiffs' Back Pay Claims Are Baseless.

The Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967). Claims alleging that no payment (or insufficient payment) has been made by the Government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also United States v. Testan, 424 U.S. 392, 401-02 (1976) ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim--whether it be the Constitution, a statute, or a regulation--does not create a cause of action for money damages

unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)); see also Martinez v. United States, 333 F.3d 1295, 1302-03 (Fed. Cir. 2003).

It is this category of claims that plaintiffs rely heavily upon to establish the jurisdiction of this Court. However, as stated above, in order to properly invoke Tucker Act jurisdiction concerning a claim for back pay, a plaintiff must point to a substantiative right to money damages against the United States. James v. Caldera, 159 F.3d 573, 580 (Fed. Cir. 1998) (citing Hamlet v. United States, 63 F.3d 1097, 1101 (Fed. Cir. 1995)). This means that a Tucker Act plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States. Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997).

Plaintiffs attempt to rely upon the "primary basic pay statute in existence at the time" to support their claim for back pay and benefits. However, as discussed below, that pay statute is inapplicable to plaintiffs as such benefits were strictly limited by Congress pursuant to 38 U.S.C. § 107, as acknowledged by plaintiffs in their complaints. Further, 38 U.S.C. § 107 has been challenged several times by World War II Philippine veterans, but has been upheld repeatedly by various Circuit Courts, including the Federal Circuit. Talon v. Brown, 999 F.2d 514 (Fed. Cir. 1993) (Court upheld the constitutionality of 38 U.S.C. § 107(a)); see also Quiban v. Veterans Administration, 928 F.2d 1154 (D.C. Cir. 1991) (upheld the constitutionality of 38 U.S.C. §§ 107(a) and (b)); Besinga v. United States, 14 F.3d 1356 (9th Cir. 1994) (upheld the constitutionality of 38 U.S.C. § 107(a)). Absent a money-mandating statute, this Court lacks the power to grant any relief and should dismiss the complaint. Smith v. Sec'y of the Army, 384

F.3d 1288, 1292 (Fed. Cir. 2004); Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); Sanford v. United States, 32 Fed. Cl. 363, 365 (1994).

2. Plaintiff's Citizenship Claim Barred.

The plaintiffs' claims for citizenship are not properly before this Court. The Tucker Act authorizes certain monetary claims against the Government. See Testan, 424 U.S. at 400. A demand for citizenship is not a monetary claim. Nor can construing it as a Due Process claim preserve it before this Court since the Court of Federal Claims does not possess jurisdiction over "alleged violations of the Due Process Clauses of the Constitution." Montalvo v. United States, 231 Ct. Cl. 980, 982-83 (1982); see also Spehr v. United States, 51 Fed. Cl. 69, 94 (2002) ("The court also lacks subject matter jurisdiction over plaintiff's claims based on 'due process' violations under the 5th and 14th amendments to the Constitution, because these are not money-mandating provisions."), aff'd, 49 Fed. Appx. 303 (Fed. Cir. 2002).[6]

Therefore, while there is no merit to plaintiffs' arguments that they are entitled to citizenship based upon their birth in the Philippines, as discussed at length below, this Court does not have jurisdiction to consider those claims regardless of merit, because such claims are not embraced by the Tucker Act. Thus, because plaintiffs failed to allege an "illegal" extraction and the basic pay statute does not afford plaintiffs any right to monetary compensation (and, in fact, such compensation has been expressly limited by Congress), plaintiffs have failed to prove the jurisdiction of this Court and cannot maintain a Tucker Act action for these claims.

6 The equal protection clauses of the Constitution are of no help to plaintiffs either, because neither clause mandates the payment of money damages by the Government, even if violated. LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995).

**D. Statute of Limitations Bars Plaintiffs' Claims**

1. 28 U.S.C. § 2501 Bars Plaintiffs' Claims Under The Tucker Act.

As stated above, this Court is one of limited jurisdiction and its authority to grant relief against the United States is limited by the extent to which the United States has waived its sovereign immunity. Testan, 424 U.S. at 399. Such a waiver "must be unequivocally expressed in the statutory text, and will not be implied." Lane v. Pena, 518 U.S. 187, 192 (1996). Indeed, the Government's consent to be sued "must be construed strictly in favor of the sovereign." United States v. Nordic Village, Inc., 503 U.S. 30, 33-34 (1992).

The Tucker Act's six-year statute of limitations states that a plaintiff must file suit within six years of the date that a claim first accrues. 28 U.S.C. § 2501. This statute is an express limitation upon the Government's waiver of sovereign immunity and cannot be waived. Hart v. United States, 910 F.2d 815, 818-19 (Fed. Cir. 1990). Thus, if a claim is asserted outside of the limitations period, this Court must dismiss the claim for lack of jurisdiction. Cottrell v. United States, 42 Fed. Cl. 144, 154 (1998).

Plaintiffs claim that the U.S. Army failed to fully compensate them for their (or their family members') service during World War II. The last plaintiff to be discharged from the military, albeit the Philippine military, was discharged on May 18, 1949. Ferrer Compl., ¶ 11. Plaintiffs' service deemed to be active service in the U.S. Armed Forces by VA for purposes of 38 U.S.C. § 107 terminated on June 30, 1946. Hernandez Compl., ¶ 11; Abella Compl., ¶¶ 11-12; see 38 U.S.C. § 107(a). Because the last of the plaintiffs was discharged over 58 years ago, their claims are barred by the statute of limitations. The statute of limitations is jurisdictional and must be strictly construed to avoid the prosecution of stale claims. Soriano v. United States, 352 U.S. 270, 273-74 (1957); Irwin v. Veterans Administration, 498 U.S. 89 (1991).

Compliance with the statute of limitations is a condition of the United States' consent to suit, and thus is also a condition upon this Court's jurisdiction. Soriano, 352 U.S. at 273-74.

2. Plaintiffs' Causes of Action Accrue at the Time of Plaintiffs' Discharge.

A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, that is, when "all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." Nager Elec. Co. v. United States, 368 F.2d 847, 851 (Ct. Cl. 1966); see Catawba Indian Tribe of S.C. v. United States, 982 F.2d 1564, 1570 (Fed. Cir. 1993); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988). In a military discharge case, this Court and the Federal Circuit have long held that a plaintiff's cause of action for back pay accrues at the time of the plaintiff's discharge. See Martinez v. United States, 333 F.3d at 1303; Bowen v. United States, 292 F.3d 1383, 1386 (Fed. Cir. 2002); Real v. United States, 906 F.2d 1557, 1560 (Fed. Cir. 1990); Williams v. Sec'y of the Navy, 787 F.2d 552, 562 n.15 (Fed. Cir. 1986); Bray v. United States, 785 F.2d 989, 994 (Fed. Cir. 1986); Bonen v. United States, 666 F.2d 536, 539 (Ct. Cl. 1981).[7]

The service member therefore has the right to sue immediately upon discharge for the funds improperly withheld. Moreover, the courts have made clear that a Tucker Act claim for back pay accrues all at once at the time of discharge; the claim for back pay is not a "continuing claim" that accrues each time a payment would be due throughout the period that the service member would have remained upon active duty. See Longhine v. United States, 230 Ct. Cl. 920,

---

7 Other courts have also held that a cause of action for unlawful discharge accrues at the time of discharge. See Geyen v. Marsh, 775 F.2d 1303, 1308 (5th Cir. 1985); Walters v. Sec'y of Defense, 725 F.2d 107, 114 (D.C. Cir. 1983); Nichols v. Hughes, 721 F.2d 657, 659 (9th Cir. 1983); Ballenger v. Marsh, 708 F.2d 349, 350 (8th Cir. 1983).

922 (1982); Vincin v. United States, 468 F.2d 930, 933 (Ct. Cl. 1972); Mathis v. United States, 391 F.2d 938, 939 (Ct. Cl. 1968). If the plaintiff does not file suit within the six-year limitation period prescribed in 28 U.S.C. § 2501, the plaintiff loses all rights to sue for the loss of pay. That is, the claim accrues "at one time, once and for all," on the date of discharge, even though the asserted obligation to pay the plaintiff, upon which the claim is based, continues past the date of discharge. Mathis, 391 F.2d at 939.

This Court addressed this exact issue when it dismissed the complaint brought by Plaintiff Entines in 1996. In Entines v. United States, 39 Fed. Cl. 673 (Fed. Cl. 1997), the Government moved to dismiss plaintiffs' claims for back pay and related Fifth Amendment claims based upon the statute of limitations. In granting the motion to dismiss, this Court concluded that plaintiffs' breach of contract claims all accrued more than six years before they filed their complaint. Such claims, the Court determined, were barred by the statute of limitations. Id. at 679.

**E. 38 U.S.C. § 511(a) Bars Plaintiffs' Claims for Veterans Benefits**

This Court does not have jurisdiction to consider Plaintiffs' allegations that they were wrongfully denied VA benefits because they raise an issue that 38 U.S.C. § 511(a) bars this Court from reviewing. See Ferreiro v. United States, 72 Fed. Cl. 1, 6 (2006); Carlisle v. United States, 66 Fed. Cl. 627, 633-34 (2005); Van Allen v. United States, 66 Fed. Cl. 294, 296 (2005). But cf. Hanlin v. United States, 214 F.3d 1319, 1321 (Fed. Cir. 2000) (holding, in a different context, that attorney's complaint presented a nonfrivolous allegation of implied-in-fact contract that was sufficient to confer jurisdiction in U.S. Court of Federal Claims), rev'd & remanded, 50 Fed. Cl 697 (2001) (holding no enforceable implied-in-fact contract claim existed).[8]

8 In Hanlin, the Federal Circuit stated that it did not read 38 U.S.C. § 511(a) "to require the Secretary, and only the Secretary, to make all decisions related to laws affecting the provision of

Section 511(a), as amended by the Veterans' Judicial Review Act ("VJRA"), Pub. L. No. 100-687, Div. A, § 101, 102 Stat. 4105-06 (1988), and the Department of Veterans Affairs Codification Act, Pub. L. No. 102-83, § 2(a), 105 Stat. 378, 388 (1991), provides in pertinent part that:

> The Secretary [of Veterans Affairs] shall decide all questions of law and fact necessary to a decision by the Secretary under a law that affects the provision of benefits by the Secretary to veterans or the dependents or survivors of veterans. Subject to subsection (b), the decision of the Secretary as to any question shall be final and conclusive and may not be reviewed by any other official or by any court, whether by an action in the nature of mandamus or otherwise.[9]

The VJRA also vested the United States Court of Appeals for Veterans Claims ("Veterans Court") and the United States Court of Appeals for the Federal Circuit ("Federal Circuit") with "exclusive jurisdiction" over appeals concerning VA decisions. Pub. L. No. 100-687, § 301(a), 102 Stat 4113, 4120 (codified as amended at 38 U.S.C. §§ 7252(a) and 7292(c)). These statutes plainly bar this Court from exercising jurisdiction over plaintiffs' complaints challenging VA benefit decisions. See In re Russell, 155 F.3d 1012, 1013 (8th Cir. 1998) (dismissing for lack of jurisdiction veteran's petition for mandamus relief directing Board and Veterans Court to decide

---

[veterans] benefits." 214 F.3d at 1321. Hanlin involved a claim by a veteran's attorney for attorney fees based upon a "non-frivolous allegation of the existence of an implied-in-fact contract," which was sufficient to confer jurisdiction in this Court under 28 U.S.C. § 1491(a)(1). The Federal Circuit in Hanlin rejected the notion that 38 U.S.C. § 511(a) impliedly repeals 28 U.S.C. § 1491(a)(1). Id. In contrast, plaintiffs who seek veterans' benefits do not allege that they are entitled to the benefits based upon the existence of a contract or any other allegation sufficient to confer jurisdiction upon this Court pursuant to 28 U.S.C. § 1491(a)(1).

9 The only exceptions to preclusion of review specified at 38 U.S.C. § 511(b) are challenges to rulemaking under 38 U.S.C. § 502, certain insurance questions under 38 U.S.C. §§ 1975 and 1984, matters relating to housing and small business loans under 38 U.S.C. ch. 37, and review of Board of Veterans' Appeals decisions in the Court of Appeals for Veterans Claims under 38 U.S.C. ch. 72. None of these exceptions apply in this case.

claim for disability benefits); Sugrue v. Derwinski, 26 F.3d 8, 11 (2d Cir. 1994) (upholding dismissal of complaint challenging VA denial of claim for increased rating); Beamon v. Brown, 125 F.3d 965, 967 (6th Cir. 1997) (upholding dismissal of plaintiffs' claims challenging VA procedures for processing claims); Zuspan v. Brown, 60 F.3d 1156, 1158-59 (5th Cir. 1995) (upholding dismissal of veteran's claim that he had been denied adequate medical care in violation of the Rehabilitation Act, stating that "VJRA . . . created an exclusive review procedure by which veterans may resolve their disagreements with [VA]"). Accordingly, plaintiffs' claims against VA for veterans benefits should be dismissed pursuant to RCFC 12(b)(1) for lack of subject-matter jurisdiction.

Plaintiffs also alleges that the Government violated the Due Process Clause of the United States Constitution. Entines Compl. ¶ 38; Rodriguez Comp. ¶ 32. However, it is well-established that this Court lacks jurisdiction over such claims because the Due Process Clause is not a "money-mandating provision." James, 159 F.3d at 581; LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995).

**F. Plaintiffs' Claims Are Meritless**

1. 38 U.S.C. § 107 Is Constitutional.

As previously stated, the decision by Congress to limit and/or deny various veterans' benefits to Philippine service members following World War II has been held to be constitutional multiple times by many courts. See, e.g. Talon v. Brown, 999 F.2d 514 (Fed. Cir. 1993) (Court upheld the constitutionality of 38 U.S.C. § 107(a)); Quiban v. Veterans Administration, 928 F.2d 1154 (D.C. Cir. 1991) (Court upheld the constitutionality of 38 U.S.C. §§ 107(a) and (b)); Besinga, 14 F.3d at 1361-62 (upheld the constitutionality of 38 U.S.C. § 107(a)).

In Talon this Circuit adopted the United States Court of Appeals for the District of Columbia's approach in Quiban to the question of the constitutionality of 38 U.S.C. § 107. Talon, 999 F.2d at 517. In Quiban, the court, relying upon the Supreme Court's decisions in Califano v. Torres, 435 U.S. 1 (1978) (per curiam), and Harris v. Rosario, 446 U.S. 651 (1980) (per curiam), concluded that the proper standard of review when faced with a challenge to 38 U.S.C. § 107 is the rational basis test. 928 F.2d at 1160-61. Concluding that there was a rational basis for the statute and that it is constitutional, that court found that three factors were dispositive: United States taxes had never been imposed in the Philippines, which had never contributed to the funding of United States veterans' benefits; the cost of extending full benefits to veterans of the Philippine Army would approach two billion dollars annually for a substantial period of time; and the extension of benefits to the Philippine veterans might seriously disrupt the economy of that country. Id. at 1161. The Ninth Circuit similarly concluded that the statute, subject to rational review, was a perfectly proper expression of congressional intent.

> Under the rational basis standard of review, it is not our place to second-guess Congress' motivations. Whether Congress . . . based . . . its [decision on the understanding that] the payment of benefits would be prohibitively expensive or whether Congress acted out of the more enlightened concern that the direct payment of benefits to hundreds of thousands of Filipino men and women might be perceived as a threat to the sovereignty of the soon-to-be-independent Republic of the Philippines is of no moment. A single rational factor will sustain the statute.

Besinga, 14 F.3d at 1362.

In short, plaintiffs' challenge to the validity or constitutionality of 38 U.S.C. § 107 merits no further consideration than has already been afforded in this circuit and others. That statute establishes the benefits that Philippine World War II veterans can receive. It has already been challenged, scrutinized, and upheld, demonstrating clearly the futility of plaintiffs' position.

2. Plaintiffs' Property Claims Are Baseless.

While plaintiffs fail to establish a jurisdictional basis for a challenge under the Takings Clause of the Fifth Amendment or an alleged violation of the Contracts Clause, their claims are meritless in any event. In order to establish a taking under the Fifth Amendment, plaintiffs must first establish a compensable property interest. Karuk Tribe of Cal. v. Ammon, 209 F.3d 1366, 1374 (Fed. Cir. 2000) (stating that under takings analysis, "first, a court determines whether the plaintiff possesses a valid interest in the property affected by the governmental action"). The Supreme Court has held that the Constitution does not create property interests. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1001 (1984). Rather, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source." Id. (citing Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980); Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)). Case law provides that military benefits are defined by statute. "A soldier's entitlement to pay is dependent upon statutory right." Wyatt v. United States, 2 F.3d 398, 400 (Fed. Cir. 1993) (quoting Bell v. United States, 366 U.S. 393, 401 (1961)); see also Perry v. Sinderman, 408 U.S. 593 (1972).

To the extent that plaintiffs believe they (or their family members) were entitled to more pay or additional benefits, contractually or otherwise, their subjective beliefs afford them no relief. Entitlement to military pay and allowances arises out of statutes and regulation, not the subjective expectations of members of the armed services; "'[a] soldier's entitlement to pay is dependent upon statutory right,' and that accordingly the rights of the affected service members must be determined by reference to the statutes and regulations . . . rather than to ordinary contract principles." United States v. Larionoff, 431 U.S. 864, 869 (1971) (citing Bell v. United States, 366 U.S.393, 401 (1961)). Military pay depends upon an exercise of legislative grace,

not upon principles of contract. See Zucker v. United States, 758 F.2d 637, 640 (Fed. Cir. 1985) (explaining that Federal workers' "entitlement to retirement benefits must be determined by reference to the statutes and regulations governing these benefits, rather than to ordinary contract principles"); see also Bell at 401 ("A soldier's entitlement to pay is dependent upon statutory right.").

Therefore, since 38 U.S.C. § 107 is the statute that defines the benefits plaintiffs are entitled to receive, and that statute is constitutional, their argument that the denial of VA benefits or payment of VA benefits at a reduced rate violates the Takings Clause of the Fifth Amendment or the Contracts Clause is untenable and must be dismissed. Gonzalez v. United States, 48 Fed. Cl. 176, 181 (Fed. Cl. 2000) (There is no property interest that can be "taken" by operation of 38 U.S.C. § 107).

3. Plaintiffs' Citizenship Claims Are Meritless.

Plaintiffs also allege that this Court should grant them citizenship based upon their birth in the Philippine Islands, "while those islands were United States possessions." See Complaints, Count VI. Jurisdictional problems aside (discussed above), this claim is wholly without merit. With Spain's cession of the Philippines to the United States, inhabitants upon those islands collectively became nationalized but not naturalized. Spanish subjects residing in ceded territory became nationals of the United States unless it was otherwise provided by treaty. "Accordingly, it was realized that while all citizens of the United States were nationals, not all nationals were citizens. A hybrid status appeared, the so-called 'non-citizen national.'" Cabebe v. Acheson, 183 F.2d 795 (9th Cir. 1950).

During the twelve year interval between the Act of 1934 and final independence in 1946, the Philippines were in what has been described as a "unique" status. Although not in all

respects a "foreign" territory, the Philippines were treated by the Act of 1934 as a foreign country for many purposes, e.g., Filipino citizens were treated as aliens for immigration purposes; foreign service officers assigned to the Philippines were treated as if stationed in a foreign country; and the Act of 1934 defined "United States" as excluding the Philippines. See Hooven v. Evatt, 324 U.S. 652, 677-8 (1945).

In March 1942, Congress amended the 1940 immigration laws to make American citizenship more readily available to aliens who served honorably in the United States Armed Forces during World War II.[10] Petitions for naturalization, however, had to be filed by December 31, 1946.[11] In addition to the explicit cutoff date in the amended 1940 Act, Congress adopted a new liberalized citizenship program in 1948 that excluded Filipino servicemen, and specifically provided that even applications timely filed under the 1940 Act and still pending would be adjudged under the new provisions. Act of June 1, 1948, Ch. 360, 62 Stat. 281. These provisions were carried forward into the 1952 Nationality Act, see 66 Stat. 250, 8 U.S.C. § 1440. Finally, in 1961, Congress amended the 1952 Act by adding § 310(e), 8 U.S.C. § 1421(e), which specifies that "any" petition thereafter filed will be adjudged under the requirements of the 1952 Act.

The congressional command here could not be more manifest. Neither by application of the doctrine of estoppel, nor by invocation of equitable powers, nor by any other means does a court have the power to confer citizenship in violation of the limitations imposed by Congress

10 The specific act is §§ 701 to 705 of the Nationality Act of 1940, Ch. 876, 54 Stat. 1137, as amended by the Second War Powers Act of 1942, § 1001, Ch. 199, 56 Stat. 182, 8 U.S.C. §§ 1001 to 1005 (1940 ed., Supp. V).

11 During this time frame, over 7,000 Filipino soldiers were naturalized as American citizens. INS v. Hibi, 475 F.2d 7, rev'd on other grounds, 414 U.S. 5 (1973).

pursuant to its naturalization power under Article I, Section 8, clause 4 of the Constitution. INS v. Pangilinan, 486 U.S. 875 (1988). Or, as the Supreme Court has stated, "'[o]nce it has been determined that a person does not qualify for citizenship, . . . the district court has no discretion to ignore the defect and grant citizenship.'" Fedorenkov. United States, 449 U.S. 490 (1981) (citation omitted). Thus, even if the Court deems it has jurisdiction upon this issue, which we dispute, the Court cannot grant plaintiffs citizenship. Therefore, we respectfully request this claim be dismissed.

## CONCLUSION

For the foregoing reasons, we respectfully request that this Court grant defendant's motion to dismiss plaintiffs' complaints.

Respectfully submitted,

JEANNE E. DAVIDSON
Director

/s/ Donald E. Kinner
DONALD E. KINNER
Assistant Director

/s/ Kenneth S. Kessler
KENNETH S. KESSLER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor, 1100 L St., N.W.
Washington, D.C. 20530
Tel: (202) 307-0313

Of Counsel:
CAPTAIN KEVIN MCCART
Military Personnel Branch
U.S. Army Litigation Division
901 N. Stuart St.
Arlington, VA 22203-1837

Date: June 14, 2007